CHRISTIAN SAUTTER, JR., Respondent, *v.* JOHN C. FULMER et al., as Executors of and Trustees under the Will of JACOB ANGE, Deceased, Appellants.

W. STRONG CLOHER et al., as Executors of WILLIAM H. CLOHER, Deceased, Respondents, *v.* JOHN C. FULMER et al., as Executors of and Trustees under the Will of JACOB ANGE, Deceased, Appellants.

WILLIAM I. TABER, Respondent, *v.* JOHN C. FULMER et al., as Executors of and Trustees under the Will of JACOB ANGE, Deceased, Appellants.

T. HARVEY FERRIS, Respondent, *v.* JOHN C. FULMER et al., as Executors of and Trustees under the Will of JACOB ANGE, Deceased, Appellants.

GEORGE W. GAMMEL, Respondent, *v.* JOHN C. FULMER et al., as Executors of and Trustees under the Will of JACOB ANGE, Deceased, Appellants.

FIRST BANK AND TRUST COMPANY OF UTICA, as Executor of JOHN H. SIEMERS, Deceased, Respondent, *v.* JOHN C. FULMER et al., as Executors of and Trustees under the Will of JACOB ANGE, Deceased, Appellants.

CARRIE B. SHERMAN, Respondent, *v.* JOHN C. FULMER et al., as Executors of and Trustees under the Will of JACOB ANGE, Deceased, Appellants.

108

(Argued November 24, 1931; decided January 5, 1932.)

*Frank H. Hiscock* and *Arthur J. Foley* for appellants. There was no fiduciary relation between defendant Fulmer and the plaintiffs; therefore, no duty on the part of said defendant or the other defendants to disclose the negotiations between the purchasers and the defendants. (*Carpenter* v. *Danforth*, 52 Barb. 581; *Terry* v. *Green*, 185 App. Div. 517; *Board of Commissioners* v. *Reynolds*, 44 Ind. 509; *Waller* v. *Hodge*, 215 Ky. 705; *Bawden* v. *Taylor*, 254 Ill. 464; *Seitz* v. *Frey*, 188 N. W. Rep. 266; *Stout* v. *Cunningham*, 33 Ida. 464; *White* v. *Texas Co.*, 202 Pac. Rep. 826.)

*Thayer Burgess* and *Sherrill Babcock* for respondents. The defendant Fulmer occupied a fiduciary relationship toward the plaintiffs and was under a duty to disclose to them the negotiations between the purchasers and the defendants. (*Stappenbeck* v. *Fulmer*, 210 App. Div. 611; 223 App. Div. 810; 249 N. Y. 594; *Falk* v. *Hoffman*, 233 N. Y. 199; *McManus* v. *Durant*, 168 App. Div. 643; *Von Au* v. *Magenheimer*, 126 App. Div. 257; *Farmers L. & T. Co.* v. *N. Y. & N. R. Co.*, 150 N. Y. 410; *Wheeler* v. *Abeline Nat. Bank Building Co.*, 159 Fed. Rep. 391; *Strong* v. *Repide*, 213 U. S. 419.) The trial court properly excluded evidence as to value of any agreements of defendants to keep out of the newspaper business and to indemnify the corporation against suits. (*Stappenbeck* v. *Fulmer*, 210 App. Div. 611; 223 App. Div. 810; 249 N. Y. 594.)

O'BRIEN, J. The Utica Sunday Tribune Company had an authorized capital of $60,000 divided into six

hundred shares. These seven plaintiffs together with one other stockholder owned a minority interest of two hundred and ninety-three shares. Defendants owned the majority interest consisting of three hundred and seven shares. All the capital stock was purchased by Erwin R. Davenport, Frank E. Gannett and Woodford J. Copeland. The complaint in each action alleges that defendant Fulmer, prior to the sale, dominated the management of the corporation, that, as the principal negotiator of the sale, he fraudulently represented to plaintiffs that an opportunity was present to sell the stock at $300 a share and that in reliance upon that fraudulent representation they sold their holdings at that price, whereas defendant Fulmer sold his own stock and that of his majority associates for $1,098 a share. All the essential allegations of the complaints were found as facts and the interlocutory judgments order that defendants account, in the ratio of each plaintiff's holdings to the entire stock, for the property received by defendants from the proceeds of the sale of the entire stock. The judgments also direct a referee to take and state the accounts.

We have carefully considered all the evidence in the case and without reciting it in detail, we find ample support for the essential findings and hold that such findings against one occupying a fiduciary position sustain the judgments. (*Falk* v. *Hoffman*, 233 N. Y. 199; *Meinhard* v. *Salmon*, 249 N. Y. 458; *Stappenbeck* v. *Fulmer*, 223 App. Div. 810; affd., 249 N. Y. 594.)

The principal issue arises from the first question certified. We are asked to decide whether defendants are entitled to exclude from the sums, for which they are liable, the value of certain special contracts into which they entered with the purchasers at the time they sold their majority stock and subsequent to the time of the sale of the minority interest. Prior to the sale of the majority stock, Fulmer and his attorney by payment made with the attorney's personal check from funds procured

by a loan to the attorney which was secured by collateral supplied by Fulmer, purchased the two hundred and ninety-three shares of the minority stock for $87,900, or $300 per share, delivered it to the purchasers and received from them the sum of $87,900. Subsequently, on April 6, 1922, the purchasers in writing agreed with the majority stockholders to buy their " three hundred and seven shares of the capital stock of said corporation for the sum of $337,100." This purchase, standing by itself, would be at the rate of $1,098 per share. The agreement, however, recites that the consideration for the purchase at this price is the sellers' covenants thereinbefore stated. Those covenants are as follows: The sale and delivery, without mention of price, of three hundred and seven shares of the capital stock, indemnification of the corporation from any libel suits growing out of any act committed by the corporation during the time that it was under Fulmer's control, indemnification against claims not appearing on its books and records with two exceptions, indemnification from any additional assessment for income tax or franchise tax for any period ending prior to January 1, 1922, abstention for ten years from engaging in the newspaper business in this State, acceptance of the purchasers' bonds in substitution for their note and a warranty as to the truth of the financial statements which accompanied the agreement. The facts are found that prior to the consummation of the sale the purchasers had offered defendants the sum of $280,000 for their controlling stock and the covenants later included within the contract of April 6, 1922; that at the same time Fulmer had placed a price on the controlling stock and such covenants of $350,000, but that the purchasers and the majority stockholders finally reached the figure of $425,000 for the whole plant, represented by all the stock. The finding is silent whether the proposed sale at $425,000 was to include the covenants, which were later incorporated in the agreement of April 6th, but the evidence

of one of the purchasers is to the effect that they were not only buying the stock but were also exacting certain things from Mr. Fulmer. His testimony on that subject, however, is casual and parenthetical. Some warrant for a conclusion that Fulmer's covenant to refrain from engaging in the newspaper business for ten years may be regarded as negligible in value, as far as he is concerned, might appear when it is contrasted with his statements to the plaintiffs that he was tired of the business and his health was worth more than the paper.

We may not hold, as matter of law, that these covenants are entirely devoid of value but they are so intermingled and confused with the sale of the stock at $1,098 a share that the two transactions cannot be severed. The value of the covenants is so vague and their connection with the selling price of the stock so indistinct that to discover the point at which one begins and the other ends is impossible. Even if one could be disentangled from the other, no fairly accurate value could be assigned to the covenants. The main purpose of the agreement unquestionably was a sale of three hundred and seven shares of stock for $337,100. That is the price which the purchasers contracted to pay for that number of shares. When the consideration for the purchase at that price is stated to be the covenants set forth, any process by which some shadowy value might conceivably be attached to them would become too complicated and artificial to lead to any practical result. The tangle, by analogy, resembles confusion of goods. (*Underhill* v. *Schenck*, 238 N. Y. 7, 18; *Hamilton Shoe Co.* v. *Wolf Bros.*, 240 U. S. 251, 262.) Assuming that the covenants possess some value, that value must be regarded as in the nature of a profit or an attempted profit. That defendant violated his fiduciary relations with his associates who trusted him has been found on sufficient evidence. His written assurance to the plaintiff Ferris that " an offer has been made of $300 a share for the

stock " may lead to the proper inference that he clearly intimated that all stockholders were to be treated the same. Plaintiff Sautter's testimony, when credited by the finders of fact, shows that defendant informed that plaintiff that the purchasers had offered to pay $300 a share " for all of the stockholders, share and share alike." Defendant saw to it that they were not treated alike. We must assume that he received or expected to receive some benefit growing out of his assent to the collateral covenants. Otherwise he would not have consented to them. His arrangements for the sale of his own stock were essentially different from those which he negotiated for his associates and were kept secret from them. Under such circumstances, even if the things which he exchanged for such benefit as accrued or as he expected to accrue to him are not entirely worthless, they are unavailable to diminish his obligations. (*Murray* v. *Beard*, 102 N. Y. 505.)

The judgment in each action should be affirmed, with costs, and the certified questions answered as follows: No. 1, " no; " No. 2, " yes; " No. 3, " yes; " No. 4, " no."

CARDOZO, Ch. J., POUND, CRANE, LEHMAN and KELLOGG, JJ., concur; HUBBS, J., not sitting.

Judgments affirmed, etc.